Jason T. Dennett, WSBA #30686
Kaleigh N. Boyd, WSBA #52684
**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Ave, Ste 1700
Seattle, WA 98101
jdennett@tousley.com
kboyd@tousley.com

*Attorneys for Plaintiff and the Proposed Class*

[ADDITIONAL COUNSEL APPEAR ON THE SIGNATURE PAGE]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**
**SPOKANE DIVISION**

| | |
|---|---|
| **JACK POST**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**T.R.A. INDUSTRIES, INC. D/B/A HUNTWOOD INDUSTRIES**,<br><br>Defendant. | Case No. 2:25-cv-397<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Jack Post ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant T.R.A. Industries, Inc. d/b/a Huntwood Industries ("Huntwood" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on

information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant Huntwood is a "premier custom cabinet compan[y] in the United States" that supplies custom residential cabinetry and commercial cabinetry for various institutions, including for organizations in the healthcare and education industries.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its current and former employees and customers. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

5. Plaintiff is a Data Breach victim, being a former employee of Defendant. He brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

6. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, Huntwood's current and former employees' private information was exactly that—private. Not anymore. Now, their private information

[1] *Huntwood Industries,* HUNTWOOD, https://www.linkedin.com/company/huntwood-industries/about/ (last visited Sept. 19, 2025).

is forever exposed and unsecure.

## PARTIES

7. Plaintiff, Jack Post, is a natural person and citizen of Idaho. He resides in Post Falls, Idaho, where he intends to remain.

8. Defendant T.R.A. Industries, Inc. d/b/a Huntwood Industries is a Washington profit corporation with its principal place of business at 23800 E Appleway Ave, Liberty Lake, Washington, 99019.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members and Plaintiff and Defendant are citizens of different states.

10. This Court has personal jurisdiction over Defendant because it is headquartered in Washington and regularly conducts business in Washington.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### ***Defendant Collected and Stored the PII of Plaintiff and the Class***

12. Defendant states it is "the largest custom cabinet manufacturer in the Western United States." [2] According to Defendant, it operates from a 630,000-square-foot, state-of-the-art facility in Liberty Lake, WA, with a team of over 700 skilled and dedicated professionals.[3]

---

[2] Why Huntwood, HUNTWOOD, https://www.huntwood.com/why-huntwood/ (last visited Sept. 19, 2025).

[3] *Id.*

13. As part of its operations, Defendant receives and maintains the PII of hundreds of its current and former employees.

14. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with state and federal law. Plaintiff and Class Members themselves took reasonable steps to secure their PII.

15. On information and belief, Defendant maintains internal policies that promise to safeguard its employees' PII.

16. Under state and federal law, organizations like Defendant have duties to protect their current and former employees' PII and to notify them about breaches.

***Defendant's Data Breach***

17. According to RedPacket Security, an online information security news source, on or about August 25, 2025, the cybercriminal group known as "Interlock" posted on its dark web portal that it had hacked Defendant.[4,5]




18. Interlock's August 25, 2025, post states "Size: 3670 GB," "Files: 1,298,256" and "Folders: 229,520," indicating that it has stolen a substantial amount of data from Defendant.[6]

19. The post also contains a link labeled "GET," indicating that Plaintiff's and the Class's sensitive PII is available for anyone to access.

---

[4] *[INTERLOCK] – Ransomware Victim: Huntwood Industries*, REDPACKET SECURITY (April 25, 2024), https://www.redpacketsecurity.com/interlock-ransomware-victim-huntwood-industries/.

[5] The screen shots of the dark web posts were obtained from Ransomlook, an open-source project that tracks ransomware-related posts from various sites across the dark web. *See About*, RANSOMLOOK, https://www.ransomlook.io/about (last visited Sept. 19, 2025).

[6] *See* n. 4.

20. Further, the post displays a web-based file manager, which is presented as the interface for managing the stolen files.[7] This indicates the attackers have made available a browsable view of the exfiltrated data rather than a simple dump.[8]




22. According to the Federal Bureau of Investigation and the Cybersecurity and Infrastructure Security Agency's joint bulletin on Interlock, the group is known to use social engineering techniques to gain access to organization's computer network, such as by tricking individuals into executing a malicious payload under the guise of fixing an issue on the organization's system.[9]

23. Once inside the network, Interlock actors navigate the organization's storage accounts and then exfiltrate the organization's data using various transfer tools.[10] After, Interlock encrypts the organization's systems, it sends the organization a message to contact the group on its dark web portal.

---

[7] *Id.*
[8] *Id.*
[9] *#StopRansomware: Interlock*, CISA (July 22, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-203a.
[10] *Id.*




24. Interlock actors then instruct the organization to make ransom payments in Bitcoin to cryptocurrency wallet addresses provided by the actors.[11] The actors threaten to publish the exfiltrated data to their leak site on the dark web unless the ransom is paid.[12] Interlock has been observed following through on this threat.[13]

25. Defendant has made no public statements regarding the Data Breach, Interlock, or whether it paid a ransom demand.

26. However, on information and belief, even if Defendant made a ransom payment, there is no guarantee that the data Interlock stole will be deleted.[14] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[15]

27. Cybercriminal groups can therefore monetize stolen PII and sell it on

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[15] *Id.*

the dark web as part of a full identity profile.[16] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[17]

28. Furthermore, on information and belief, Defendant has not reported the Data Breach to the Washington State Office of the Attorney General as required by RCW 19.255.

29. As a result, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely impaired.

30. Defendant had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

31. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, such as encrypting the PII or deleting it when it is no longer needed.

32. Interlock targeted, accessed, and acquired files containing PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

33. Plaintiff further believes that his PII and that of Class Members was subsequently published or sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type, and specifically, Interlock.

***Plaintiff's Experiences and Injuries***

---

[16] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited Mar. 6, 2025).

[17] *Id.*

34. Plaintiff Jack Post is a former employee of Defendant.

35. As a condition of employment, including for payroll and for participation in Defendant's health plan, Plaintiff provided Defendant with his PII. In doing so, Plaintiff trusted that Defendant would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

36. On September 26, 2025, Defendant sent Plaintiff a Notice of Data Breach Letter informing him that his PII was compromised as a result of the Data Breach.

37. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

38. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

39. And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and phishing texts and phone calls.

40. Once an individual's PII is for sale and access on the dark web, as Plaintiff's is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[18] On information and belief, the spam and phishing calls and texts that Plaintiff is experiencing was made possible as a result of Defendant's Data Breach and the subsequent exposure of Plaintiff's PII to cybercriminals.

41. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

---

[18] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

42. Because of Defendant' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

43. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

44. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. PII is a form of intangible property—property that Defendant were required to adequately protect.

45. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

46. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

47. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

48. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant' possession—and is thus at risk for futures breaches so long as Defendant fail to take appropriate measures to protect the PII.

49. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

50. The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

51. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

52. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

53. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

54. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

55. Defendant disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

56. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

57. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

58. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[19]

59. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[20]

60. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants industry, including Defendant.

***Consumers Prioritize Data Security***

61. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[21] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[22]

---

[19] *2024 Data Breach Report* at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[20] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[21] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited July 19, 2025).

[22] *Id*. at 3.

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[23]

c. 89% of consumers stated that "I care about data privacy."[24]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[25]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[26]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[27]

62. Defendant knew or should have known that adequate implementation of cybersecurity and protection of PII, including Plaintiff's and the Class's PII, was important to its employees.

***Defendant Failed to Follow FTC Guidelines***

63. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

64. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data

---

[23] *Id.*
[24] *Id.* at 9.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 11.

security principles and practices businesses must use.[28] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

65. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

66. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

67. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of

---

[28] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68. In short, Defendants failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

69. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

70. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

71. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the National Institute of Standards and Technology ("NIST") Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

72. These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its employees. Upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following Class:

> All individuals residing in the United States whose PII was compromised in the Data Breach, including all those individuals who received notice of the breach.

74. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant have a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

75. Plaintiff reserves the right to amend the class definition.

76. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

77. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant' custody and control.

78. <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes hundreds of current and former employees of Defendant.

79. <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as

each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

80. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

81. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members —for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

82. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## COUNT I
## Negligence
## (On Behalf of Plaintiff and the Class)

83. Plaintiff realleges all previous paragraphs as if fully set forth below.

84. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

85. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

86. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

87. Defendant owed these duties to Plaintiff and the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff's and Class members' PII.

88. Defendant owed—to Plaintiff and Class members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

89. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

90. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

91. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

92. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

93. Further, under the FTCA, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

94. Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTCA also form part of the basis of Defendant' duty to protect Plaintiff's and the Class members' sensitive Information.

95. Defendant violated its duty under Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

96. The harm that has occurred is the type of harm the FTCA is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against

businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

97. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

98. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII —whether by malware or otherwise.

99. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

100. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

101. Defendant breached these duties as evidenced by the Data Breach.

102. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

103. Defendant breached its duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which

actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

104. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

105. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

106. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

107. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

108. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

109. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

Plaintiff realleges all previous paragraphs as if fully set forth below.

110. Plaintiff and the Class delivered their PII to Defendant as part of the process of obtaining employment provided by Defendant.

111. Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members if and when their data had been breached and compromised. Each such contractual relationship imposed on Defendant an implied covenant of good faith and fair dealing by which Defendant was required to perform its obligations and manage Plaintiff's and Class Members' data in a manner which comported with the reasonable expectations of privacy and protection attendant to entrusting such data to Defendant.

112. In providing their PII, Plaintiff and Class Members entered into an implied contract with Defendant whereby Defendant, in receiving such data, became obligated to reasonably safeguard Plaintiff's and the other Class Members' PII.

113. In delivering their PII to Defendant, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard that data.

114. Plaintiff and the Class Members would not have entrusted their PII to Defendant in the absence of such an implied contract.

115. Defendant accepted possession of Plaintiff's and Class Members' PII.

116. Had Defendant disclosed to Plaintiff and Class Members that Defendant did not have adequate computer systems and security practices to secure employees' PII, Plaintiff and members of the Class would not have provided their PII to Defendant.

117. Defendant recognized that its employees' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members.

118. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

119. Defendant breached the implied contract with Plaintiff and Class Members by failing to take reasonable measures to safeguard the PII in its care.

120. Defendant breached the implied contract with Plaintiff and Class Members by failing to promptly notify them of the access to and exfiltration of their PII.

121. As a direct and proximate result of the breach of the contractual duties, Plaintiff and Class Members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiff and the Class Members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiff's and Class Members' PII; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their PII; (g) the diminution in the value of the services bargained for as Plaintiff and Class Members were deprived of the data protection and security that Defendant promised when Plaintiff and the proposed class entrusted Defendant with their PII; and (h) the continued and substantial risk to Plaintiff's and Class Members' PII, which remains in the Defendant' possession with inadequate measures to protect Plaintiff's and Class Members' PII.

## COUNT III
## Unjust Enrichment
## (On Behalf of Plaintiff and the Class)

122. Plaintiff realleges all previous paragraphs as if fully set forth below.

123. This claim is pleaded in the alternative to the breach of contractual duty claim.

124. Plaintiff and members of the Class conferred a benefit upon Defendant in providing PII to Defendant.

125. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and the Class. Defendant also benefited from the receipt of Plaintiff's and the Class's PII, as this was used to facilitate the services and goods it sold to Plaintiff and the Class.

126. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the Class's PII because Defendant failed to adequately protect their PII. Plaintiff and the proposed Class would not have provided their PII to Defendant had they known Defendant would not adequately protect their PII.

127. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

## COUNT IV
## Invasion of Privacy—Intrusion Upon Seclusion
## (On Behalf of Plaintiff and the Class)

128. Plaintiff realleges all previous paragraphs as if fully set forth below.

129. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

130. Defendant owed a duty to its employees, including Plaintiff and the Class, to keep this information confidential.

131. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII is highly offensive to a reasonable person.

132. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant as part of their relationship with Defendant, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

133. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

134. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

135. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

136. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

137. As a proximate result of Defendant' acts and omissions, the PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

138. Unless and until enjoined and restrained by order of this Court, Defendant' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

139. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant' inability to safeguard the PII of Plaintiff and the Class.

140. In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Class, also seeks compensatory damages for Defendant' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**COUNT V**
**Violation of the Washington Consumer Protection Act**
**RCW 19.86.010, et seq.**
**(On Behalf of Plaintiff and the Class)**

141. Plaintiff realleges all previous paragraphs as if fully set forth below.

142. The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

143. Defendant is a "person" as described in RCW 19.86.010(1).

144. Defendant engaged in "trade" and "commerce" as described in RCW 19.86.010(2) in that it engages in commerce directly and indirectly affecting the people of the State of Washington.

145. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach,

Defendant engaged in unlawful, unfair, and fraudulent practices within the meaning of, and in violation of, the CPA, in that Defendant's practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons.

146. Defendant's failure to safeguard the PII exposed in the Data Breach constitutes an unfair act that offends public policy.

147. Defendant's failure to safeguard the PII compromised in the Data Breach caused substantial injury to Plaintiff and Class Members. Defendant's failure is not outweighed by any countervailing benefits to consumers or competitors, and it was not reasonably avoidable by consumers.

148. Defendant's failure to safeguard the PII disclosed in the Data Breach, and its failure to provide timely and complete notice of that Data Breach to the victims, is unfair because these acts and practices are immoral, unethical, oppressive, and/or unscrupulous.

149. Defendant violated the CPA by, *inter alia*:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

150. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their PII.

151. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on their omissions.

152. Had Defendant disclosed to Plaintiff and Class Members that their data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue its operations, and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the PII that Plaintiff and Class Members entrusted to them while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendant' omissions, the truth of which they could not have discovered through reasonable investigation.

153. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

154. As a direct and proximate result of Defendant' unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to

monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

155. The gravity of Defendant' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant' legitimate business interests other than engaging in the above-described wrongful conduct.

156. Defendant's unfair or deceptive acts or practices occurred in its trade or business and have injured and are capable of injuring a substantial portion of the public. Defendant' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

157. Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself and the Class, seeks restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it.

158. Plaintiff, on behalf of himself and Class Members, also seeks to recover actual damages sustained by each Class Member together with the costs of the suit, including reasonable attorney fees. In addition, Plaintiff, on behalf of himself and Class Members, request that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each Class Member by three times the actual damages sustained, not to exceed $25,000.00 per Class Member.

**COUNT VI**
**Violation of the Washington Data Breach Notification_Disclosure Law**
**RCW 19.255.005 et seq.**
**(On Behalf of Plaintiff and the Class)**

159. Plaintiff realleges all previous paragraphs as if fully set forth below.

160. Under RCW 19.255.010(2), "[a]ny person or business that maintains or possesses data that may include personal information that the person or business does not own or license shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery[.]"

161. On information and belief, this statute applies to Defendant because Defendant does not own nor license the PII exposed.

162. The Data Breach at issue constitutes a "breach of the security of the data" under RCW 19.255.010.

163. Defendant violated the Washington Data Breach Notification Disclosure Law when it failed to disclose the Data Brech to Plaintiff and Class Members "immediately following discovery" nor in a reasonable timely manner. Thus, Plaintiff seeks all available relief.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further unfair and/or deceptive practices;

E. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Dated: October 3, 2025

By: *<u>/s/ Jason T. Dennett</u>*
Jason T. Dennett, WSBA #30686
By: *<u>/s/ Kaleigh N. Boyd</u>*
Kaleigh N. Boyd, WSBA #52684

**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Ave, Stte 1700
Seattle, WA 98101
jdennett@tousley.com
kboyd@tousley.com

John J. Nelson (*Pro Hac Vice anticipated*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212

Tel.: (858) 209-6941
jnelson@milberg.com

*Attorneys for Plaintiff and the Proposed Class*